923 F.Supp. 1216 (1996)
FORT ZUMWALT SCHOOL DISTRICT, Plaintiff,
v.
MISSOURI STATE BOARD OF EDUCATION, et al., Defendants.
No. 4:93CV01710.
United States District Court, E.D. Missouri.
May 1, 1996.
*1217 *1218 Teri B. Goldman, Associate, Peper and Martin, St. Louis, MO, James G. Thomeczek, St. Louis, MO, for Ft. Zumwalt School District, plaintiff.
Edwin H. Steinmann, Jr., Assistant Attorney General, Jefferson City, MO, for Board of Education, Missouri State, defendant.
Michael H. Finkelstein, Keith D. Halcomb, Missouri Protection & Advocacy Services, Jefferson City, MO, for Robert C., Ann C., defendant.

MEMORANDUM
GUNN, District Judge.
This matter is before the Court following a bench trial held on November 16, 1995.
*1219 Plaintiff Fort Zumwalt School District (the "District") filed suit against defendants Missouri State Board of Education and Robert and Ann Clynes, as Parents and Next Friends of Nicholas Clynes on July 29, 1993. Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1491o, plaintiff seeks judicial review of a decision by a State Level Review Officer ("SLRO") appointed by the Missouri State Board of Education. 20 U.S.C. § 1415(e)(2).
On August 19, 1993 the Clynes filed a cross-appeal and a counterclaim against plaintiff seeking damages under IDEA; the Americans with Disabilities Act, 42 U.S.C. § 12132; 42 U.S.C. § 1983; and the Rehabilitation Act, 29 U.S.C. § 794. In an Order dated October 11, 1994 this Court granted plaintiff's motion and dismissed the Clynes' counterclaim for failure to state a claim. Fort Zumwalt School Dist. v. Missouri State Bd. of Educ., 865 F.Supp. 604, 607 (E.D.Mo. 1994).
The parties later agreed that the Missouri State Board of Education was not an appropriate defendant, and the Court dismissed plaintiff's case against it on November 1, 1995.

I. FINDINGS OF FACT
1. Nicholas R. Clynes was born on March 24, 1981. (Exh. R-1 at 2.) At all relevant times, Nicholas and his natural parents, Robert and Ann Clynes, resided in the Fort Zumwalt School District. (Tr. at 4-6; Exh. R-1 at 5.)
2. Nicholas attended kindergarten at Hawthorn Elementary School in the Fort Zumwalt School District during the 1986-87 school year. (Tr. at 19-20.)[1] He attended and repeated first grade there during the 1987-88 and the 1988-89 school years. (Tr. at 27, 34.) He was promoted to second grade and then to third grade at Hawthorn for the 1989-90 and the 1990-91 school years respectively. (Tr. at 39, 43.)
3. Nicholas attended a summer session at a private school, the Churchill School, in 1991. (Tr. at 69.) He went on to attend the Churchill School during the school years of 1991-92 and 1992-93. (Tr. at 119-21, 135.)
4. The Churchill School is a private not-for-profit school located in Ladue, Missouri. (Exh. P-30 at 1.) The school accepts and educates only children with learning disabilities. Id.
5. In kindergarten, Nicholas began to experience problems with his attitude and behavior. (Exhs. R-3, R-4.)
6. Later that year, Attention Deficit Disorder and hyperactivity were ruled out. (Tr. at 31.)
7. Nicholas was first evaluated by the District for learning disabilities in March of 1987. (Exh. R-1 at 6.) That preliminary evaluation led to more extensive testing in May of 1987. (Exh. R-3 at 1.) The District diagnosed Nicholas as being delayed in the areas of reading and math by one year or more. (Exh. R-3 at 6.) The parties do not dispute that Nicholas is learning disabled.
8. The District identified Nicholas' educational needs and recommended "highly structured individualized instruction in the areas of reading and math"; a "multi-modal approach to instruction"; and a "behavior modification program to provide additional structure and enhance task focus/completion skills." (Exh. R-4 at 2.)
9. The District developed an individual educational program (an "IEP") for Nicholas at that time which was to include 375 minutes per week of individualized special education in the Learning Disabled Resource Room ("LD Resource Room") at Hawthorn. (Exh. R-5 at 8.) The IEP also set objectives in areas of word attack skills, word recognition and comprehension, and numbers and computation. (Exh. R-5 at 4-7.) Nicholas was to spend 21% of his time in the LD Resource Room and the rest in the general program for his grade level. (Exh. R-5 at 8.)
10. The IEP was implemented for the 1987-88 year. (Exh. R-6.) In January of *1220 1988, the District increased Nicholas' time in the LD Resource Room to 525 minutes per week. (Exh. R-7.) Nicholas thereafter spent 29% of his time at school each week in the LD Resource Room.
11. Despite glowing comments from his first grade instructors, in March of 1988 the District recommended that Nicholas be retained in first grade. (Exhs. R-8; Deft-AQ.)
12. In April of the same year, the Clynes and Nicholas began seeing Dr. Cheryl L. Nietfeldt, Ph.D., a psychologist. (Exhs. P-9, P-10.)
13. The Clynes worked with Dr. Nietfeldt to address Nicholas' attitude problems: Nicholas was feeling different from his peers, seemed to lack confidence, and was showing signs of depression and frustration. (Exhs. P-9, P-10, R-3, R-4.)
14. In May of 1988, the District again developed an IEP for Nicholas for the 1988-1989 school year. (Exh. R-11.) The IEP outlined 375 minutes in the LD Resource Room and set objectives in word recognition, reading comprehension, proofreading, and computation and application skills. (Exh. R-11 at 4-8.) Nicholas was to spend 21% of his time in the LD Resource Room and the rest in the general program for his grade level. (Exh. R-11 at 8.)
15. Nicholas seemed to do better academically during his second year as a first grader although his grades dropped during the last quarter of the year. (Exhs. Deft-AQ, Deft-AR.) He went from an A - in Math in the first quarter to a C in the last quarter. (Exh. Deft-AR at 112.) He went from an A - in Reading in the third quarter to a B - in the last quarter. Id. His Spelling grade dropped from a B in the first quarter to a C - in the last quarter. Id. His effort was ranked as satisfactory and at times, as outstanding. Id. His teacher Mr. Arnett commented on his fourth quarter performance: "Nick's grades dropped as the subject areas became more difficult, but I am still relatively pleased with his progress. He just needs to be more confident and not give up so easily." Id. at 113.
16. Mr. Arnett recognized in a report on Nicholas' behavior dated May 30, 1989 that: "Nick's biggest problem seems to be his attitude. While his disabilities are an obvious factor, his attitude is even more of a hindrance to his academic progress." (Exh. R-14 at 61.) Mr. Arnett recommended constant positive reinforcement, repetition, and redirection. Id.
17. In May of 1989, the District developed a IEP for Nicholas for his second grade year, the 1989-90 school year. (Exh. R-12.) The District recommended 300 minutes per week in the LD Resource Room, and the IEP outlined objectives in the areas of comprehension and word identification, writing skills, and computation. (Exh. R-12 at 3-6.) Nicholas was to spend 15% of his time in the LD Resource Room and the rest in the general program for his grade level. (Exh. R-12 at 6.)
18. At the start of his second grade year, in September, the District reevaluated Nicholas for learning disabilities. (Exh. R-15.) Test scores revealed that Nicholas' word attack skills, oral reading, and comprehension were all below grade level. Id. at 2. His writing was deemed below an age appropriate level. Id.
19. Nicholas' behavior evaluation at that time exposed "interpersonal difficulties, inappropriate behaviors, unhappiness and depression, and physical symptoms/fears." Id. at 5. Nicholas was described as "poorly motivated" and "easily frustrated." Id. at 7. The evaluation also noted Nicholas' chronic difficulties with feeling "different" from his peers. Id. at 1.
20. When Miss Ruhr, Nicholas's LD Resource Room instructor from his second year as a first grader through third grade, observed Nicholas during his English class in September of 1989, she noted that Nicholas was not reading along with the other children. (Exh. R-14 at 64-5.)
21. For the final quarter of his second grade year, Nicholas earned a C - in Math, D - in Reading, and a C in Spelling. (Exh. Deft-AS at 114.) His teacher Mrs. Porter commented: "In English, he rushes through his work and will many times turn in incomplete work." (Deft-AS at 115.) She recognized his weaknesses: "[Nicholas] is having *1221 problems in math and reading.... [I]n reading he is having difficulty with comprehension and of course, word attack skills." Id.
22. In May of 1990, an IEP was developed for Nicholas' upcoming third grade year. (Exh. R-18.) The IEP set objectives in word recognition and comprehension, language skills, and computation. (Exh. R-18 at 4-8.) The IEP allowed for 225 minutes per week in the LD Resource Room. (Exh. R-18 at 9.) Nicholas was to spend 13% of his time in the LD Resource Room and the rest in the general program for his grade level. (Exh. R-18 at 9.)
23. The IEP did not set any goals for word attack skills despite the fact that the District attributed Nicholas' weakness with word attack skills to his learning disability. (R. at 65.) The focus of the IEP was on comprehension and memorizing Dolch sight word lists.
24. The District reduced the amount of time in the LD Resource Room for the 1990-91 IEP because District staff felt that Nicholas was frustrated and embarrassed by being pulled out of the regular classroom and put in the LD Resource Room each day. (Tr. at 44.)
25. Nicholas did not receive a grade above a C during the 1990-91 school year. (Exh. Deft-AT.) He began the year with a C in Arithmetic, a C in Language, a D in Reading, and a C in Spelling. By the end of the year, Nicholas had failed Spelling and managed to raise a failing grade in Reading for the third quarter to a D for the final quarter. His other grades remained Cs and C - s. For every grade below a C, Nicholas' teacher Mrs. Styrk graded his corresponding effort as needing improvement.
26. Mrs. Styrk's written comments also criticized Nicholas' efforts. After the second quarter, she wrote: "Nick can do fine work when he puts his mind to it. He needs to realize that his attitude is reflected in his grades." After the third quarter, she wrote: "The reading grade reflects his effort, not his ability." After the fourth quarter, Mrs. Styrk stated: "Nick needs to take more responsibility for his work. He needs to stop the excuses & just work! Sometimes I think he tries to manipulate us all!" Id.
27. Miss Ruhr and Mrs. Styrk filled out a report for the Churchill School on Nicholas in May of 1991. (Exh. P-5; Tr. at 282-85.) The teachers indicated that by the end of third grade Nicholas was not able to write in complete sentences or understand paragraph format and structure. (Exh. P-5 at 2.) They also reported that he did not understand the rules of capitalization or punctuation. Id. They explained that his reading level was "on-grade" and "low average" but that his phonics skills were weak and below grade level. Id. at 3. They commented: "At times, Nick does not put forth the effort to see continuing success. Often he appears to be apathetic about school."
28. The District recognized early on, in May of 1987, Nicholas had trouble learning with phonics. (Tr. at 289.) Nicholas, in fact, was most successful learning through visual, rather than auditory means. (Exh. R-3 at 12.) However, Miss Ruhr used phonics with Nicholas anyway because she thought that she should try it with him. (Tr. at 289.)
29. Miss Ruhr also used Dolch sight word lists with Nicholas; this method of teaching requires a student to learn to recognize certain words on a list and to understand their meaning when used in sentences. (Tr. at 290-93.)
30. As far as decoding skills, Miss Ruhr agreed that the word attack goals set in IEPs for the years before third grade involved teaching Nicholas how to recognize certain consonants and then some diphthongs and digraphs and to break down words into recognizable parts. (Tr. at 292, 296.) However, Miss Ruhr indicated that for the years in question she focused her efforts with Nicholas on comprehension.
31. For Miss Ruhr: "[C]omprehension is what reading is all about." Id. at 292. She would ask Nicholas to read passages and then retell the story or details from the story. Id. at 291-92. She wanted Nicholas to be able to rephrase the main idea with his own words. Id. at 294. She expected him to read by using his "sight vocabulary skills." Id. at 296. She also taught him to use *1222 "context clues" to determine an unknown word. Id. at 295.
32. Miss Ruhr testified before this Court that Nicholas was reading at grade level when he left Hawthorn. (R. at 70.) However, according to documentation, after conducting standardized testing of Nicholas at the end of his third-grade year, Miss Ruhr concluded that Nicholas' total reading skills were at a second-grade level; Nicholas' word comprehension skills were the only ones near grade-level. (Exh. Deft-CN; R. at 51.)
33. In September of 1989, Nicholas' word attack skills were at a first-grade level. (Exh. Deft-CN.) By May of 1991 his word attack skills had hardly improved; they were still at a first-grade level. Id.
34. Nicholas' test scores are consistent with Miss Ruhr's testimony regarding her own teaching methods. Miss Ruhr was successful at teaching Nicholas how to figure out stories in books by looking at pictures and recognizing three letter words by sight, but she did not teach him how to decode and read new words.
35. Reading requires both comprehension and word attack skills. (R-29 at 152, Woodcock Reading Mastery Tests Revised.)
36. When Nicholas entered the 1991 summer session at Churchill School, he could not read words that were new to him. (Tr. at 60, 198; R. at 85; Exh. PS-1.) He did not know his ABC's, the days of the week, or the months of the year. (Tr. at 115; Exh. PS-3.)
37. Nicholas could identify three-letter consonant-vowel-consonant words, and he could use sighted words to garner the meaning of passages. (Tr. at 214, 228.) That is, he could recognize words that he memorized, words from the Dolch sight word lists, as one would recognize a picture or a drawing but he had no way of figuring out a word that he had not seen before. Id. at 228-30. Nicholas therefore exhibited strength in the area of comprehension but serious weakness with word attack skills consistent with his learning disabilities. (Exhs. Deft-CN, P-17, PS-1, R-9.)
38. Nicholas' performance in school had declined from first to third grade because it became harder and harder for him to memorize and retain the growing vocabulary he needed to pass his classes. (Tr. at 228-30.)
39. Mrs. Burke, the District's own psychological examiner, has admitted that tests showed that Nicholas was not reading at grade level when he left Hawthorn. (Tr. at 242; R. at 66.)
40. In May of 1991, the District drafted an IEP for the 1991-92 school year. The IEP set objectives in word recognition and comprehension, language skills, word attack skills, writing skills, spelling, multiplication and fractions, and computation. (Exh. R-22 at 3-14.) The IEP included 525 minutes per week in the LD Resource Room. (Exh. R-22 at 15.) Nicholas was to spend 26% of his time in the LD Resource Room and the rest in the general program for his grade level. (Exh. R-22 at 15.)
41. The 1991-92 IEP did set goals for word attack skills which focused on learning to recognize prefixes and suffixes. However, Miss Ruhr testified that she would have worked with Nicholas to "to increase his vocabulary" of sighted words. (Tr. at 296.)
42. At the IEP meeting, Mrs. Clynes questioned the District's efforts at educating her son and informed District staff that her son would be attending the Summer Session at the Churchill School. (Tr. at 69.) Miss Ruhr told her that she did not know what else to do for Nicholas, and she blamed Nicholas' attitude for his lack of progress. Id. at 70. According to Miss Ruhr, Nicholas had chosen to not learn. Id.
43. When Mrs. Clynes called Mrs. Moore, the Director of Special Education for the District, to discuss her concerns over the May, 1991 test scores and the IEP conference, Mrs. Moore told her that there are some children who are just "non-readers" despite the District's efforts. Id. at 72.
44. Nicholas attended a summer program at Churchill School in 1991. At that time, Nicholas had not been assured placement for the 1991-92 school year at Churchill. (Tr. at 68-69; Exh. R-23.)
45. The District never recommended a summer program for Nicholas. (Tr. at 49, 97.) Although, at the end of third grade, *1223 Miss Ruhr did recommend that Nick work on his own during the summer to ensure that he retained what he learned that year. (Exh. R-20 at 4.)
46. The Churchill School takes a remedial approach to learning. (Tr. at 190.) The school's programs focus on teaching a student how to learn, rather than teaching a student content. Id. at 190-191. For example, according to Mr. Brubaker, a former Assistant Director of the school: "We are teaching a kid how to spell `zebra' instead of what it is." Id. at 191.
47. The centerpiece of the Churchill School's educational program is the tutorial. (Tr. at 192.) The tutorial involves one-on-one instruction for 15% to 20% of a student's day. Classes outside the tutorial focus on practicing what students learn in their tutorial sessions.
48. The classes may have seven students and one teacher. However, the student gets a great deal of one-on-one attention because students are doing different things from one another in class; the classes do not involve teachers lecturing and questioning students on specific material. (Tr. at 235-36.) The tutorial teacher directs what a student learns in the other classes rather than the tutorial material just supporting regular class work. (Tr. at 192, 236-37.)
49. The Churchill School also offers a demystification program. (Tr. at 215.) Through the program, each student learns to understand and accept her specific learning disability. Id. at 216.
50. The student-teacher ratio at the Churchill School is approximately three to one. (Tr. at 191.)
51. At the conclusion of the 1991 Summer term, Churchill School notified the Clynes that a place had opened up for Nicholas at the School for the 1991-92 school year and that Nicholas would be given that place because he successfully completed the summer program. (Exh. P-24.)
52. In a letter dated August 2, 1991 the Clynes informed Hawthorn School that Nicholas would not be attending that fall. (Exh. P-24 at 1.) The Clynes expressed regret over District staff's inability to address Nicholas' problems despite the efforts of the Clynes to work with the District. Id.
53. At the Churchill School, Nicholas' attitude and self-esteem improved as did his reading skills. (Tr. at 125-30, 208, 212, 214.) As Nicholas made academic progress and as his word attack skills improved, his attitude, his willingness to meet new challenges, and his self-esteem improved. (R. at 97-98, Test. of Mrs. Gilligan, Director of the Churchill School; Exh. R-25.)
54. Nicholas benefitted from the Churchill School's demystification program. (Tr. at 216.) He earned a role in a school play about learning disabilities. Id. at 216-17.
55. The self-contained environment of the Churchill School also proved beneficial to Nicholas' emotional growth; he did not feel "different" from his peers. (Tr. at 219.) At Hawthorn, Nicholas' emotional progress was stunted by his frustration over being pulled out of normal classes and put in the LD Resource Room each day. Id.
56. In reports to the District gathered for a September 2, 1992 reevaluation, the Churchill teachers described Nicholas as having "good behavior" and as not being a "problem student." (Exh. R-25.) The Churchill teachers recognized that Nicholas would become exasperated with himself when presented with new material. Id. Ms. Fahsl, his tutorial instructor, wrote: "Nick comes to class very organized. He promptly gets all materials and homework ready. He stays focused most of class.... He gets very frustrated and angry with himself when a mistake is made in his work. His attitude quickly changes if you bring it to his attention." Id. at 134. Ms. Blair, Nicholas' math teacher, commented: "When presented with a new learning situation, he frequently feels he will be unable to `get it.' His automatic response is to shut down and withdraw, or express anger." Id. at 136. Nicholas required "prompt[ing]" to ask for help, according to his auditory-visual instructor, Ms. Brotherton. Id. at 138.
57. Tests administered by the District for the September, 1992 revaluation showed improvement in Nicholas' word attack skills. (Exh. R-29 at 152.)
*1224 58. Tests administered by the Churchill School also revealed progress with word attack skills. (Exh. R-33 at 163.)
59. Grade reports from the 1991 Summer Session, the 1991-92 school year, and the 1992-93 school all indicate that Nicholas was making progress with his reading and math. (Exhs. P-4, Deft-A, Deft-B.) The Churchill School quarterly reports are detailed. The School does not award grades but instead ranks a student's progress and effort towards specific goals set each quarter with "excellent," "satisfactory," or "needs improvement."
60. The 1991 Summer Session report indicates success with positive reinforcement to maintain motivation, reinforcement of appropriate behaviors after being corrected, and with allowing Nicholas to help other students to increase confidence. (Exh. P-4.)
61. The report also describes effective techniques for learning employed with Nicholas, including a linguistic approach to reading and spelling, devices to aid Nicholas in remembering spelling and sequential skills, and proofreading for one item at a time. Id. All of Nicholas' marks are "satisfactory" or "excellent" for that summer. Id.
62. In September of 1991, standardized test results indicated that Nicholas' reading skills ranked in the 2nd to 9th percentile. (Exh. Deft-C at 40.) The same tests administered in May of 1992, after a year at the Churchill School, showed a rise in the ranking of Nicholas' reading skills to a range between the 12th and 54th percentile. Id. Nicholas' rank in word attack skills jumped from the 2nd percentile to the 25th percentile. Id.
63. Nicholas achieved this success through a program used by the Churchill School called "Let's Read." (Tr. at 192.) The program involves a linguistic approach to reading and employs a multi-sensory method. Id. A teacher must receive special training to learn how to use the "Let's Read" program as well as many of the other methods of teaching used at the Churchill School. (Tr. at 234.)
64. Nicholas' quarterly reports for the 1991-92 school year also document improvement with "satisfactory" progress noted throughout the year in Language Arts and "excellent" progress noted by the fourth quarter in Math. (Exh. Deft-B at 26-29.) He made strides during the year towards understanding capitalization and punctuation, as well as long division. Id. His note taking and proofreading skills and his grasp of sequencing also improved. Id. at 30-32.
65. In May of 1992, the Clynes and the District attempted to develop an IEP for the 1992-93 school year; however, the IEP was not completed at that time. (Exh. R-35.)
66. The Clynes were never offered an opportunity to participate in making an IEP by the District. (Tr. at 64.) When they would come to the IEP conferences, the IEPs were already completed. Id. The Clynes did not understand that they could accept or reject an IEP; they thought that by signing the IEP they were acknowledging their attendance and not their acceptance. Id. at 152. They realized when Nicholas was in third grade that they were supposed to participate in creating the IEP, and they would not sign and accept the IEP developed in May of 1991 for Nicholas' fourth-grade year. Id.
67. In October of 1992, the District drafted an IEP for the 1992-93 school year. The IEP set objectives in decoding, vocabulary, comprehension, written expression, word problems, multiplication and division, decimals, fractions, and study skills. (Exh. R-37 at 5-16.) The IEP recommended that Nicholas spend 1050 minutes per week in the LD Resource Room. Id. at 17. Nicholas was to spend 58% of his time in the LD Resource Room and the rest in the general program for his grade level. Id. The general program classes would include physical education, music, and a library program. Id.
68. An assessment of Nicholas' skill level at that time noted positive advances in Nicholas' acceptance and understanding of his learning disability and in the areas of reading and writing. (Exh. R-36 at 168-71.)
69. A staffing report by the District in October of 1992 states that Nicholas experienced "significant academic growth" during the 1992-93 year. (Exhs. R-32, R-34.) According *1225 to the report, teacher observations indicated "emotional growth," specifically in the areas of "self-concept, task completion, task initiation, and the development of coping mechanisms to deal with frustration." (Exh. R-34 at 164.)
70. The District's 1992-93 October IEP did not offer a tutorial program where one teacher would manage Nicholas' curriculum and work. (Tr. at 217-18.)
71. The 1992-93 IEP also did not have an auditory visual component. (Tr. at 217-18.)
72. The IEP did not include a program designed to help Nicholas recognize and accept his learning disabilities. (Exh. R-37.)
73. There is no evidence that the District staff would have changed their methods of educating Nicholas. There is no evidence that they would have used a linguistic approach to addressing Nicholas' word attack skills.
74. The 1992-93 IEP offered a "self-contained" learning disabilities classroom. (Tr. at 259.) The District considered a self-contained program the most appropriate offering for Nicholas. Id. at 300. The program was called self-contained because Nicholas would spend in excess of three hours per day in the LD Resource Room in the company of other children with learning disabilities. Id. at 259-60.
75. Hawthorn only has one classroom which serves as the LD Resource Room and a self-contained classroom.
76. Hawthorn was not able to offer a self-contained classroom to any students until the 1992-93 school year. (Tr. at 321.) Prior to that students were sent to the District's Dardenne School for self-contained programs. Id.
77. Until the 1992-93 school year, the District had never offered a "self-contained" classroom for Nicholas at either Hawthorn or Dardenne. Id. at 97-98, 301.
78. The self-contained program outlined in the 1992-93 IEP involved the LD Resource teacher observing Nicholas' work and administering tests to him. (Exh. R-27.) This differs from the programs offered to Nicholas prior to the 1992-93 school year.
79. Under those earlier programs Miss Ruhr worked with Nicholas to achieve the IEP goals but did not have any involvement in his regular curriculum. Miss Ruhr would speak to the regular classroom teachers each week to find out which skills would be covered in the upcoming week. (Tr. at 283-84.) She did not routinely monitor Nicholas' work in the regular classroom. Id. 285.
80. Miss Ruhr taught from 13 to 24 students during the relevant years. Id. at 303. She asserts that she worked with Nicholas in groups of three or one on one. Id.
81. The District has admitted that it does not have a program similar to the Churchill School program. (Tr. at 272.)
82. Furthermore, Mrs. Burke testified before this Court that the 1992-93 IEP does not incorporate the Churchill School program. (Tr. at 52.)
83. While Churchill School staff attended the October 1992 IEP meeting, the District relied on them only to garner Nicholas' current skill levels. Id.
84. In a letter to Dr. DuBray, the District's Superintendent, dated August 6, 1992, the Clynes detail the expenses associated with the Churchill School and seek reimbursement. (Exh. P-23.) They also describe their frustration with the District and how they felt the District failed them and Nicholas. Id.
85. Their request was denied by Dr. DuBray in a letter dated August 18, 1992 although Dr. DuBray offered to meet with the Clynes and discuss Nicholas' situation. (Exh. R-27.)
86. Nicholas' quarterly reports for the 1992-93 school year reveal progress towards goals in syllabication, writing, and spelling. (Exh. Deft-A at 2-4.) He made satisfactory progress towards mastering long division and learning fractions. Id. at 6.
87. After the IEP for the 1992-93 school year was completed, the Clynes requested a due process hearing in a letter to Dr. DuBray dated November 5, 1992. (Exh. R-40.)
88. After conducting a hearing on February 1, 1993 a divided three-person panel *1226 found 2 to 1 in favor of the District on February 26, 1993. (Panel Decision.)
89. The majority found that Nicholas was not regressing while he attended Hawthorn. They found that the programs implemented at Churchill School could have been implemented at Hawthorn. (Panel Decision at 2, 5.)
90. They criticized the Clynes for "unilaterally" withdrawing Nicholas from the District for the 1991-92 school year without giving the District an opportunity to review the IEP for that year in light of Nicholas' experiences at the Churchill School over the summer. (Panel Decision at 5-6.)
91. They recognized that Nicholas made progress at Churchill School but found that Nicholas' learning disabilities were not severe enough to warrant the Churchill School's segregated environment. (Panel Decision at 2-4.)
92. The majority recommended that the District develop an IEP by working with the Churchill School and by having one teacher manage an educational program for Nicholas which would include positive reinforcement and an auditory-visual approach to instruction. The majority also recommended against the use of a cost-response behavior management system. (Panel Decision at 5.)
93. The majority focused on whether Nicholas regressed while at Hawthorn and not on whether Nicholas benefitted from the educational program designed for him at Hawthorn. Based on a finding of no regression, the majority found that the District's IEPs for Nicholas were "appropriate" although not the best. (Panel Decision at 4.)
94. The dissenting panel member found that the District had not offered Nicholas a "free appropriate public education." She cited a number of failings on the District's part. She found that the District had failed: (1) to recognize the extent of Nicholas' learning disabilities and the related behavior concerns; (2) to provide a "highly structured small class setting for total instructional needs;" (3) to address through the IEP process behavioral concerns; (4) to provide "inschool counseling for social and educational needs;" (5) to provide "sufficient special education services to meet student needs in acquiring mastery of basics;" and (6) to give parents with an opportunity to help develop the IEPs. (Panel Decision at 11.)
95. The Clynes appealed the panel's decision on March 25, 1993. After briefing and oral argument, the state-level review officer ("SLRO") issued his decision on June 29, 1993.
96. The SLRO reversed the panel decision. (SLRO decision at 13-14.)
97. The SLRO found that the District had not offered Nicholas a "free appropriate public education" for the 1991-92 school year. Id. The SLRO criticized the District for its "hit and miss approach to dealing with [Nicholas'] failures" and for failing to address Nicholas' attitude problems. Id. at 14. The SLRO wrote:
There was no focused effort to follow up on failures and to produce a plan of progress that could be clearly demonstrated. The District is not under any obligation to make Nicholas an honor student, however it should demonstrate that it has identified the problem areas, applied the appropriate resources and has either produced satisfactory results or has an explanation why the student's performance is the best that can be expected from him.
Id. at 14-5.
98. The SLRO found that Nicholas made progress at the Churchill School: "Emotional and physical problems have been brought under control and there has been a marked improvement in his academic performance." Id. at 6.
99. The SLRO also concluded that the District was willing to offer Nicholas everything offered by Churchill School for the 1992-93 school year. Id. at 15.
100. The SLRO ordered the District to reimburse the Clynes for tuition and transportation costs associated with the 1991-92 school year at Churchill School. Id. at 14.
101. The SLRO awarded the cost of the 1991 Summer Session at Churchill School because he found that the summer program was a prerequisite for the 1991-92 school year. Id.
*1227 102. The SLRO also awarded tuition and travel costs associated with the first semester of the 1992-93 school year because the District did not offer an appropriate education to Nicholas until October, 1992, after the start of that school year. Id. at 15. He stated that if the Clynes could demonstrate that they had to prepay, without a right of refund, for the whole year at Churchill School, then he would award reimbursement through the end of the 1992-93 school year. Id.
103. The SLRO set the cost of travel at the rate of twenty-eight cents per mile. Id.
104. Tuition and travel costs are as follows:

 Tuition
 Summer Session, 1991 $3,000.00
 School Year, 1991-92 $13,660.00
 School Year, 1992-93 $14,300.00
 Travel Costs
 Summer Session, 1991 $814.00
 School Year, 1991-92 $3,918.00
 School Year, 1992-93 $3,918.00
 __________
 Total: $39,610.00

(Submissions from Defs. Received November 27, 1996 at 1, 2, 4, 6, 8.)
105. In the contract which the Clynes entered into with the Churchill School, the Clynes agreed that: "The obligation to pay the tuition for the full academic year is unconditional and no portion of such tuition so paid or outstanding will be refunded or canceled notwithstanding the subsequent absence or withdrawal from the School of [Nicholas]." (Submissions from Defs. Received November 27, 1996 at 7.)
106. The payment schedule sent to the Clynes for the 1992-93 school year acknowledges that "any exception" to the policy must be approved in writing by the Treasurer of the Board of Trustees for the Churchill School. (Id. at 6; Brubaker Aff.Exh. 4 at ¶¶ 1-3.)
107. The Clynes also incurred $5,934.00 in interest payments on a $42,000 loan that they took out to pay tuition costs. (Submissions from Defs. Received November 27, 1996 at 1, 10-11.)
108. The District now appeals the SLRO's decision awarding reimbursement for the 1991-92 and the 1992-93 school years.
109. The Clynes cross-appeal the SLRO's finding that the District was "ready, willing and able to provide Nicholas anything the Churchill School had to offer" for the 1992-93 school year.
110. As of the 1995-96 school year, the Churchill School has placed Nicholas in a transitional program to prepare him to go back to the District and to be educated with nondisabled students. (R. at 88.)

II. Conclusions of Law
111. Under IDEA, states receiving certain federal funds must provide a "free appropriate public education" to all children with disabilities. 20 U.S.C. § 1412(1). Both sides agree that Nicholas is disabled, and neither plaintiff nor defendants contest the applicability of IDEA in this case. See supra ¶ 7.
112. A "free appropriate public education" is defined as:
"special education and related services that 
(A) have been provided at public expense, under public supervision and direction, and without charge,
(B) meet the standards of the State educational agency,
(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and
(D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.
20 U.S.C. § 1401(a)(18). "Special education" includes instruction in the classroom, home, hospital, institution, and in "other settings." Id. at § 1401(a)(16). "Related services" include, among other things, transportation and psychological services, and medical services for diagnostic and evaluative purposes. Id. at § 1401(a)(17).
113. "Transportation" includes travel to and from school. 34 C.F.R. 300.16(b)(14)(i).
*1228 114. IDEA requires that parents and school district representatives develop an IEP for each disabled child. 20 U.S.C. § 1414(a)(5). Each IEP must include: a statement of the child's present levels of educational performance; a statement of annual goals, including short-term instructional objectives; a statement of the specific educational services to be provided and the extent to which the child will be able to participate in regular educational programs; and the projected dates for initiation and cessation of the services. 20 U.S.C. § 1401(a)(20)(A), (B), (C), (E), (F) (In 1990, Congress added an additional IEP requirement regarding transitional services. 20 U.S.C. § 1401(a)(20)(D).)
115. Parents wanting to challenge the placement of their child are entitled to a due process hearing which may be conducted by a local educational agency or intermediate educational unit as determined by state law or the state educational agency. 20 U.S.C. § 1415(b)(2). In Missouri, a due process hearing is conducted by a three-person panel empowered by the District's Board of Education. Mo.Rev.Stat. § 162.961.
116. Any party "aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing." 20 U.S.C. § 1415(c). In Missouri, the appeal is to the State Board of Education; the Board designates a statelevel review officer to handle the case. Mo. Rev.Stat. § 162.962; State Plan for Part B of the Individuals with Disabilities Act at 40 (1994).
117. Any party aggrieved by the state agency's review of the hearing may file suit in federal court. 20 U.S.C. § 1415(e)(2). "[T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id.
118. Such relief includes retroactive reimbursement to parents. Burlington Sch. Comm. v. Massachusetts Dep't of Educ., 471 U.S. 359, 370, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985); Rapid City Sch. Dist. v. Vahle, 922 F.2d 476, 478 (8th Cir.1990). Parents do not waive any right to reimbursement if they unilaterally obtain substitute care for their child. Burlington, 471 U.S. at 372, 105 S.Ct. at 2004; Rapid City, 922 F.2d at 478.
119. However, parents must give the school district notice that they want to place their child in another school. Rapid City, 922 F.2d at 478; Evans v. District No. 17, 841 F.2d 824, 831 (8th Cir.1988). Otherwise, the school district would not have an "opportunity to make (or refuse to make) changes because the parents unilaterally removed their child from the school district." Evans, 841 F.2d at 831.
120. In this case, the Clynes worked closely with the District and gave the District notice that they wanted to place their child in another school. See supra ¶¶ 42-43, 52, 84. In Spring of 1991, the Clynes expressed dissatisfaction with their son's progress but were told by District staff that there was nothing more that could be done with their son; the District refused to initiate a change of any kind other than to increase Nicholas' time in the LD Resource Room and to continue focusing on sight vocabulary skills. See supra ¶¶ 40-43, 45, 77. In their letter to Mrs. Wiig, the Principal at Hawthorn, dated August 2, 1991, the Clynes make clear their impression that the District was unwilling to do anything other than what it offered to do in the 1991 IEP. See supra ¶ 52.
121. Where parents place their child in a private school, they are entitled to reimbursement only if the court finds that: (1) the school district did not offer a free appropriate education to their child; and (2) the private school placement was proper under IDEA. Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, ___, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993).
122. Whether a free public education is "appropriate" depends upon whether the education is "sufficient to confer some educational benefit upon the handicapped child." Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 200, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982). The child's grades, *1229 test scores, and advancements from one grade level to the next are important evidence for the court to consider in assessing whether the child has benefitted from her education. Id.
123. The district court shall base its decision on the preponderance of the evidence. Rowley, 458 U.S. at 206, 102 S.Ct. at 3051. However, the court shall give "due weight" to the administrative decisions below. Id.
124. In this case, as appellant, the District bears the burden of proof in showing that the SLRO's decision should be reversed on the issues of travel costs and tuition reimbursement for the 1991-92 and 1992-93 school years. Yankton School Dist. v. Schramm, 900 F.Supp. 1182, 1186 (D.S.D. 1995). Similarly, the Clynes bear the burden of proof on whether the SLRO wrongly found that the District was "ready, willing and able to provide to Nicholas anything the Churchill School had to offer" for the 1992-93 school year. Id.
125. The Court notes that reimbursement is not barred by a private school's failure to meet state education standards. Florence County Sch. Dist. Four v. Carter, 510 U.S. at ___, 114 S.Ct. at 365.
126. Initially, the Court concludes that Nicholas' placement at the Churchill School was proper under the IDEA for both the 1991-92 and 1992-93 school years. Nicholas made progress at the Churchill School academically and emotionally. See supra ¶¶ 53-64, 68-69, 86. The segregated environment was appropriate for Nicholas for the years at issue in this case. Even the Due Process Panel members who found for the District below endorsed the Churchill School program. See supra ¶ 91-92.
127. It is true that IDEA favors placement to the maximum extent possible with other students who are not learning disabled. 20 U.S.C. § 1412(5). That "preference, however, is not absolute." A.W. v. Northwest R-1 School Dist., 813 F.2d 158, 163 (8th Cir.1987). IDEA allows for self-contained placement "when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5). Mainstreaming is not appropriate where it would not benefit the child. French v. Omaha Public Schools, 766 F.Supp. 765, 784 (D.Neb.1991).
128. In this case, mainstreaming was not appropriate for Nicholas during the 1992-93 school year because of the nature of Nicholas' learning disabilities. Nicholas would not have benefitted from mainstreaming. The evidence shows that Nicholas' self-esteem and behavior were aggravated by his associations with students from whom he felt "different" and that consequently, his academic progress was hindered. See supra ¶¶ 5, 12-13, 16, 19, 24, 53, 55-56, 60.
129. Furthermore, the Court agrees with the SLRO's finding that the District did not offer Nicholas a "free appropriate public education" from 1991-92. See supra ¶ 97. Nicholas did not receive sufficient education benefit from the District's programs.
130. Nicholas did advance from one grade to the next after the 1988-89 school year and passed many of his classes. See supra ¶¶ 2, 15, 21, 25. However, Nicholas repeated first grade and test scores showed that his reading skills remained below grade level at the end of his third grade year. See supra ¶¶ 11, 32-33, 39. Also, he could not write a complete sentence when he entered the Churchill School. See supra ¶¶ 27. Perhaps most disturbing, Nicholas' word attack skills never advanced past a first grade level while he attended Hawthorn. See supra ¶ 33.
131. The District did not change its methods for teaching Nicholas and did not consider changing his placement even after those methods proved unsuccessful. See supra ¶¶ 18-21, 27-39. The third grade IEP did not even set goals for word attack skills. See supra ¶¶ 22-23. Faced with poor test scores in May of 1991 and declining grades, the District merely increased Nicholas' time in the LD Resource Room after decreasing it each year. See supra ¶¶ 10, 14, 17, 22, 40.
132. While the IEP for the 1991-92 school year did set goals in word attack skills, Nicholas' teacher stated that she *1230 would have continued to focus on Nicholas' vocabulary of "sighted words." See supra at ¶ 41. By failing to address Nicholas' serious decoding problems, the District failed to address adequately Nicholas' learning disability. See supra ¶¶ 23, 28-38, 41.
133. The District also did not deal with Nicholas' problems with frustration and low self-esteem. District staff blamed Nicholas for their own failures. See supra ¶¶ 26-27, 42-43. They accused Nicholas of giving up on himself when they had given up on Nicholas. Id. Nicholas' teachers during second and third grade and District officials ignored the advice of Mr. Arnett, Nicholas' first grade teacher during the 1988-89 school year. Mr. Arnett recognized early on the Nicholas could make progress with learning and overcome his lack of confidence with positive reinforcement, repetition, and redirection. See supra ¶ 16.
134. Nicholas went from spending 26% of his time in the LD Resource Room during his second year as a first grader to spending only 13% of his time in the LD Resource Room during his third grade year. See supra ¶¶ 10, 14, 17, 22. The District recognized that Nicholas did not want to feel "different" and so it allowed him to spend more time in the normal classroom. See supra ¶¶ 5, 12-13, 19, 24. The District did not help Nicholas to understand and accept his learning disabilities; instead, its teachers increased the amount of time that Nicholas spent with non-disabled students, the very people from whom Nicholas felt "different." Id. The result was detrimental to Nicholas' academic and emotional growth.
135. In light of the foregoing, the Court will affirm the SLRO's decision to award reimbursement of tuition and travel costs to the Clynes for the 1991-92 school year.
136. The Court will affirm the SLRO's decision to award the Clynes tuition and travel costs for the 1992-93 school year as well.
137. An IEP was not developed until October of 1992 for the 1992-93 school year. See supra ¶ 67. By the time the 1992-93 IEP was developed, Nicholas had already entered the Churchill School for the year and the Clynes had signed a contract with the Churchill School. See supra ¶¶ 102, 105. The contract unambiguously obligated the Clynes to pay the tuition in full for the 1992-93 school year; the contract did not entitle the Clynes to any relief from that obligation if they withdrew their son from the Churchill School in October, 1992. See supra ¶ 105.
137. The District makes much of evidence suggesting that the Churchill School may have agreed to release other parents from their payment obligations in the past. See supra ¶ 106. The Court is not impressed by such evidence; indeed, "[i]t is well settled that a party may waive any conditions of a contract in his favor." Koedding v. Slaughter, 634 F.2d 1095, 1097 (8th Cir.1980) (citing Campbell v. Richards, 352 Mo. 272, 176 S.W.2d 504, 504 (1944)). The District has not cited any support for holding that the Clynes should not be reimbursed because they failed to try and "get out" of a valid, unambiguous contract. Therefore, the Court will affirm the SLRO's decision to allow reimbursement for the whole 1992-93 year based on unambiguous contract between the Clynes and the Churchill School.
138. The Court further finds that the SLRO erred in finding that the District was "ready, willing and able to provide to Nicholas anything the Churchill School had to offer" for the 1992-93 school year. The evidence and administrative record does not support such a finding. See supra ¶¶ 46-50, 67, 70-75, 78, 81-82.
139. The District did not offer Nicholas an appropriate education for the 1992-93 school year as well.
140. The District did offer to place Nicholas in "self-contained" classroom for the 1992-93 school year. See supra ¶ 74. However, the District did not offer a tutorial program with one teacher managing Nicholas' curriculum, an auditory-visual program, a linguistic method for teaching Nicholas reading skills, or a program designed to help Nicholas recognize and accept his learning disabilities. See supra ¶¶ 67, 70-72. The District did not offer to retrain its teachers to use the Churchill School's teaching methods with Nicholas. See supra ¶¶ 63, 67, 70-73. *1231 The program offered in the 1992-93 IEP would have put Nicholas in an environment not conducive to study  a combined Resource Room and self-contained classroom where as many as 24 students would be coming in and out of the room at various times throughout the day to receive tutoring. See supra 74-75, 80.
141. Additionally, the District did not offer Nicholas a totally segregated environment. See supra ¶ 67. According to the 1992-93 IEP, Nicholas would participate in certain mainstream classes: physical education, music and a library program. Id. As discussed above, a totally segregated environment was the only appropriate environment for Nicholas during the 1991-92 and 1992-93 school years. See supra ¶ 126.

III. Conclusion
142. The SLRO's decision is affirmed in part and reversed in part. The Court affirms the SLRO's findings and award of reimbursement for the 1991-92 school year. The Court reverses the SLRO's finding that the District offered Nicholas everything provided to Nicholas by the Churchill School for the 1992-93 school year and finds that the District failed to offer Nicholas a free, appropriate education in accordance with IDEA for the 1992-93 school year.
143. Because the Court finds that the District failed to offer Nicholas a free, appropriate education for the 1991-92 and 1992-93 school years and because the Court finds that the Churchill School constituted an appropriate placement under IDEA for Nicholas for those same years, the Court will enter judgment in favor of the Clynes and against the District. The Court will award reimbursement for tuition and travel costs in the amount of $39,610.00. See supra ¶ 104.
144. IDEA does not provide for reimbursement of interest payments on the loan which the Clynes took out to pay for Nicholas' education at the Churchill School. See supra ¶ 112. Therefore, the Court will not award any sum reflecting the interest payments. See supra ¶ 107.
145. Although the Court affirms the SLRO's decision to award reimbursement for the 1992-93 school year based on the contract between the Clynes and the Churchill School for that year, the Court is awarding reimbursement for the 1992-93 school year based on its independent finding that the District did not offer a free, appropriate education to Nicholas for that year. The Court considers its affirmance of the SLRO's decision on the contract issue to be an alternative justification for the relief awarded in this case.
NOTES
[1] "Tr." designates the transcript of proceedings held on February 1, 1993 before the Due Process Hearing Panel. See infra ¶¶ 87-88. "R." designates the transcript of proceedings held before this Court.