FLOYD R. GIBSON, Circuit Judge,
concurring in part and dissenting in part.
I agree that our decision in Heidemann v. Rother, 84 F.3d 1021, 1033 (8th Cir.1996), precludes the Clyneses from recovering damages in this action, and I can conceive of no authority that would allow them compensation for interest on loans they took out to pay for Nicholas’s private schooling. Therefore, I concur in Part III of the Court’s opinion. Nonetheless, because I would affirm the district court’s judgment in toto, I respectfully dissent from Part II of the opinion.
IDEA makes available federal money to assist the states in educating disabled children. See Board of Educ. v. Rowley, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). To share in these funds, participating states must agree to offer a “free appropriate public education” to all disabled children. 20 U.S.C. § 1412(1) (1994). As a measure to ensure that Congressional goals are met, IDEA directs local school districts, in consultation with parents, teachers, and, where appropriate, the child himself, to develop an “individualized education program” (“IEP”) for each disabled student. Id. § 1401(18), (20). An IEP satisfies IDEA’S requirement of a free and appropriate education so long as it “consists of educational instruction specially designed to meet the unique needs of the [disabled] child, supported by such services as are necessary to permit the child ‘to benefit’ from the instruction.” Rowley, 458 U.S. at 188-89, 102 S.Ct. at 3042.
If parents feel that their child’s IEP does not afford a free appropriate public education, they may, under certain circumstances, unilaterally place the child in a private school pending administrative and *616 judicial review of the IEP. See School Comm. of Burlington v. Department of Educ., 471 U.S. 359, 369-70, 105 S.Ct. 1996, 2002-03, 85 L.Ed.2d 385 (1985). This is, at least from a financial perspective, a perilous maneuver, for as the majority correctly recognizes, parents are entitled to reimbursement for the costs of enrolling their disabled child in a private facility “only if a federal court concludes both that the public placement violated IDEA, and that the private school placement was proper under the Act.” Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993). Applying this test to the facts of the instant case, I agree with Judge Gunn that the Clyneses are entitled to compensation for the expenses they incurred in sending Nicholas to the Churchill School.
Before proceeding to the merits of this appeal, a word must be said about the applicable standard of review. We have described federal review of the state administrative process as a “quite narrow” endeavor. Petersen v. Hastings Pub. Sch., 31 F.3d 705, 707 (8th Cir.1994). This is because the federal courts do not possess “the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy,” Rowley, 458 U.S. at 208, 102 S.Ct. at 3052 (quotations omitted), and we must therefore give “due weight” to the state proceedings, id. at 206, 102 S.Ct. at 3050-51. In IDEA cases originating from a state such as Missouri, which has created a two-tiered administrative system, we must give deference to the opinion of the state level review officer (“SLRO”), who is the person empowered to issue a final decision for the state. See Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 624 (6th Cir.1990)(“[T]he only logical position, under Rowley and general principles of administrative law, is that federal courts are required to defer to the final decision of the state authorities, in this case that of the SLRO.”); Karl v. Board of Educ., 736 F.2d 873, 877 (2d Cir.1984)(‘We believe Rowley requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer.”); cf. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir.1996)(declining to definitively answer this question); Carlisle Area Sch. v. Scott P., 62 F.3d 520, 528-30 (3d Cir.1995)(deeming it appropriate to defer to opinion of state appeals panel, but assuming that the federal courts should accord somewhat less consideration to an appeals panel ruling that disregards a hearing officer’s credibility findings which find support in the record), cert. denied, — U.S. -, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). Likewise, though the majority is correct in stating that we should examine de novo a district court’s ultimate determination of whether an IEP is appropriate, we are bound by a district court’s underlying factual findings unless they are clearly erroneous. See Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1374 (8th Cir.1996).
In light of the detailed factual findings made by the district court, and giving “due weight” to the SLRO’s determination that the IEP for the 1991-1992 school year was inappropriate, I am unable to conclude that Fort Zumwalt provided Nicholas a free appropriate public education for that period. The district court found that from September of 1989 to May of 1991 Nicholas’s word attack skills had not risen above a first grade level, see Fort Zumwalt Sch. Dist. v. Missouri State Bd. of Educ., 923 F.Supp. 1216, 1222 (E.D.Mo.1996), and a standardized test administered in September of 1991 revealed that his reading proficiency ranked in the second to ninth percentile, see id. at 1224. At the close of his fifth year in the Fort Zumwalt School District, Nicholas Clynes, at the age of ten, still did not know the alphabet, could not recite the days of the week, and could not identify the months of the year.[8] See id. at 1222. It is true, as the majority points out, that Fort Zumwalt promoted Nicholas to the fourth grade, but it is notable that in third grade Nicholas did not receive a mark above a “C.” See id. at 1221. By the end of the year, Nicholas had failed *617 Spalling and had managed to raise a failing grade in Reading for the third quarter to a “D” for the final quarter. See id.
In the face of these disturbing trends, Fort Zumwalt prepared an IEP for 1991-1992 that did not propose any significant changes in Nicholas’s educational placement. See id. at 1222. The IEP did set goals in word attack skills, but Nicholas’s resource room instructor, Miss Ruhr, testified that she would continue to emphasize the child’s ability to recognize the meaning of sighted words, a method that had failed miserably in the past to enhance Nicholas’s reading aptitude. See id. At the meeting to discuss the IEP, the Clyneses expressed concern with Nicholas’s inability to read and asked what alternatives were available to their son. See id.; App. at 459-60. The district reacted by attributing Nicholas’s academic shortcomings to his own poor attitude and refusal to put forth the requisite effort. See Fort Zumwalt, 923 F.Supp. at 1222. Miss Ruhr stated that she had “tried everything” and did not “know what else to do”; in her opinion, Nicholas had “chosen not to learn.” See id.; App. at 26. Alarmed by this response, Mrs. Clynes later telephoned Pat Moore, Fort Zumwalt’s director of special education, to discuss Nicholas’s meager progress. See Fort Zumwalt, 923 F.Supp. at 1222. Mrs. Moore informed the worried mother that some children are simply “non-readers” despite the district’s best efforts. See id. After deciding that the district had given up on Nicholas,[9] the Clyneses enrolled the child in the Churchill School.
I agree with the SLRO and the district court that the IEP for 1991-1992 was not designed to provide “personalized instruction with sufficient support services to permit [Nicholas] to benefit educationally from that instruction.” Rowley, 458 U.S. at 203, 102 S.Ct. at 3049. By submitting an IEP substantially similar to others that had previously produced so few positive results, and by exhibiting an unwillingness to explore any different approaches,[10] Fort Zumwalt did not extend to Nicholas the free and appropriate education mandated by IDEA. To be sure, Nicholas was steadily advancing from grade to grade in the Fort Zumwalt schools, and the Supreme Court has stressed that “[t]he grading and advancement system ... constitutes an important factor in determining educational benefit,” Rowley, 458 U.S. at 203, 102 S.Ct. at 3049, but Nicholas’s achievements, particularly in the area of reading skills, can at best be described as trivial. This cannot be the sort of education Congress had in mind when it enacted IDEA. See Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120-21 (2d Cir.l997)(reasoning that the Rowley standard contemplates more than *618 mere trivial advancement); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 183 (3d Cir.1988)(“[W]hen the Supreme Court said ‘some benefit’ in Rowley, it did not mean ‘some’ as opposed to ‘none.’ Rather, ‘some’ connotes an amount of benefit greater than mere trivial advancement.”), cert denied, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); Hall v. Vance County Bd. of Educ., 774 F.2d 629, 636 (4th Cir.1985)(“Clearly, Congress did not intend that a school system could discharge its duty under [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial.”); cf. Rowley, 458 U.S. at 203 n. 25, 102 S.Ct. at 3049 n. 25 (“We do not hold today that every [disabled] child who is advancing from grade to grade in a regular public school system is automatically receiving a ‘free appropriate public education.’”). The majority, in resolving that Fort Zumwalt did offer Nicholas a free appropriate public education, not only does disservice to Congressional intent, but also disregards the deference we are required to give to the conclusion reached by the SLRO.[11]
In sum, I think the district court properly decided that the 1991-1992 IEP was deficient. I additionally believe the Churchill School was without a doubt an appropriate placement for Nicholas (the facts confirm his improvement at that school),[12] and I would thus hold that the Clyneses are entitled to reimbursement for the summer of 1991 and the 1991-92 school year. Furthermore, because the district did not prepare the 1992-93 IEP until after the Clyneses had contractually committed to send Nicholas to Churchill for that term, I would also approve reimbursement for the 1992-93 school year. To the extent the majority has decided otherwise, I respectfully dissent.

. At Nicholas's state due process hearing, his father, Robert Clynes, testified that the child had mastered these tasks within two weeks after entering the Churchill School. App. at 477.

. Mrs. Clynes's testimony regarding her conversation with Mrs. Moore provides revealing insight into the parents' point of view:
At that time, you know, [after Mrs. Moore had made the remark] about the non-reader, I then asked her if she had any knowledge of Churchill. She said, "Yes, I’m aware of Churchill but, no, I don’t per se know the programs, or anything like that,” and I had let her know that, "I'm quite concerned that something needs to be done," that I had been to my pediatrician, that, you know, "He is recommending that Nick needs more help in this area,” and she made no offer whatsoever of maybe I need to sit down with you, maybe we need to get together and see if there’s a better program for your son, at which time I proceeded to hang up from her, call my husband and say, "That's it, no one gives a blank about our son, it's time for us to take control,” and I did.
App. at 435-36.

. The majority contends that “[n]o state educational authority criticized [the district]'s method of teaching Nicholas how to read,” but the SLRO's decision included the following admonition:
The various IEPs show a hit and miss approach to dealing with [Nicholas’s] failures. There was no focused effort to follow up, on failures and to produce a plan of progress that could he clearly demonstrated. The District is not under any obligation to make Nicholas an honor student, however it should demonstrate that it has identified the problem areas, applied the appropriate resources and has either produced satisfactory results or has an explanation why the student's performance is the best that can be expected from him.
App. at 34-35 (emphasis added). While this might not be an outright condemnation of Fort Zumwalt’s teaching methods, it comes very close, and it certainly discloses the SLRO's assessment that the IEP was clearly deficient. Cf., e.g., 20 U.S.C. § 1401(20)(F) (instructing that an IEP should contain “appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved”).

. The Court does not seem to place dispositive weight upon our decision in Evans v. District No. 17, 841 F.2d 824 (8th Cir.1988), but the Court does suggest that the Clyneses did not comply with the notice requirement we announced in that case. I disagree. In Evans, we affirmed the district court’s denial of reimbursement to parents who had precipitously enrolled their child in a private school, explaining that “[a] school district should be on notice of disagreements and given an opportunity to make a voluntary decision to change or alter the educational placement of a [disabled] child.” Id. at 831-32. We acknowledged, however, that parents may independently choose an appropriate private placement "if it is likely that no change would be made which would benefit [the child] (if the school district had made it clear that no change in the placement would occur)." Id. at 832.
Unlike the claimants in Evans, see id. at 831, the Clyneses specifically requested some alternative placement for Nicholas. See App. at 460 ("[A]t th[e IEP] meeting I said, 'Well, what else can you offer, self-contained?’ ”); App. at 475-76 (“During the [IEP] meeting we said we were very dissatisfied with what was happening with Nick, he still wasn't learning. We asked them at that point in time what other programs they had, and my wife mentioned self-contained, and they said at that point in time Nick was not a candidate for self-contained.”); App. at 435-36 ("I had let [Pat Moore] know that, 'I’m quite concerned that something needs to be done,’ that I had been to my pediatrician, that, you know, ‘He is recommending that Nick needs more help in this area,' and she made no offer [of help].”). The position adopted by Nicholas's educators in answer to these pleas, as disclosed by statements at the IEP meeting and Mrs. Moore’s comments to Mrs. Clynes, evidenced a likelihood that "no change would be made which would benefit [Nicholas],” Evans, 841 F.2d at 832, and there is absolutely no reason to believe that the district would have drastically altered its stance had it received one more opportunity to assess the IEP. Consequently, I do not think Evans stands as an impediment to reimbursement in this case.

. Having determined that Fort Zumwalt did offer Nicholas a free appropriate public education, the majority has apparently found it unnecessary to evaluate the propriety of placement at the Churchill School. The Court does, though, mention IDEA’S mainstreaming requirement. See 20 U.S.C. § 1412(5) (1994). I would hold that the preference for mainstreaming is honored where parents send their child to an academy, such as the Churchill School, which employs a curriculum designed to prepare the student for a return to a regular classroom environment.