## United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 96-2503/2504

———————

Fort Zumwalt School District,    *
    *
    Appellant/Cross-Appellee,    *
    *    Appeal from the United States
       v.    *    District Court for the Eastern
    *    District of Missouri.
Robert Clynes; Ann Clynes, as    *
Parents and Next Friends of    *
Nicholas Clynes,    *
    *
    Appellee/Cross-Appellant.    *

———————

Submitted:   April 16, 1997
Filed:   July 10, 1997

———————

Before FAGG, FLOYD R. GIBSON, and MURPHY, Circuit Judges.

———————

MURPHY, Circuit Judge.

This case involves competing interests under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1499.  Robert and Ann Clynes sued the Fort Zumwalt public school district to obtain reimbursement for the cost of sending their son Nicholas to a private school for learning disabled children for the 1991-92 and 1992-93 school years.  The district court awarded reimbursement to the Clynes, but denied their additional claims for damages and interest.  Both sides appeal from the aspects of the judgment unfavorable to them. We affirm in part and reverse in part.

I.

Nicholas Clynes was diagnosed with a learning disability in reading and math when he was in kindergarten at Hawthorne school, which is part of the Fort Zumwalt school district. The school responded by developing an individualized educational plan (IEP) each year as required by IDEA to set out a curriculum to address his disabilities. See 20 U.S.C. § 1414a(5). The IEPs placed Nicholas in a classroom for learning disabled students part of each school day for individualized instruction in reading and math, but he spent the rest of the day with non-disabled students. Nicholas attended Hawthorne from kindergarten through third grade, and each year the school altered the amount of specialized instruction he received in response to his needs.

Nicholas' parents attended meetings each year in which the IEPs were discussed. The school district provided the Clynes with a written explanation of their rights under IDEA, and Mrs. Clynes later testified that she had read this information. In May 1991, the Clynes met with district representatives to discuss the IEP for 1991-92. They expressed concern with their son's progress and the way his needs were being addressed at Hawthorne. They did not sign the IEP and told the district that they had enrolled Nicholas for summer school at Churchill, a private school for the learning disabled. Mrs. Clynes testified that she had indicated at the meeting that she preferred postponing any final decision on the IEP until "the first or second week of the fall, at that time I will have more information." The IEP itself stated that it would be reviewed in September.

During the summer of 1991 Nicholas was admitted by Churchill for the school year that would begin in the fall of 1991. In August the Clynes informed the school district that Nicholas was going to attend Churchill for the 1991-92 school year. He attended the school from the summer of 1991 through at least the spring of 1993.

IDEA requires that a disabled child be provided with access to a free appropriate public education. Board of Educ. v. Rowley, 458 U.S. 176, 203 (1982). Parents who believe their child's education falls short of the federal standard may obtain a state administrative due process hearing, and in some cases may be awarded reimbursement to pay for private school costs. See 20 U.S.C. 1415(b)(2) (review process); School Comm. of Burlington, Mass. v. Department of Educ., 471 U.S. 359, 372 (1985) (reimbursement). The final determination of the state administrative process may be appealed to federal district court, 20 U.S.C. 1415(e)(2), and that court is to make an independent decision of the issues based on a preponderance of the evidence, giving "due weight" to the state administrative proceedings. Rowley, 458 U.S. at 205-06. The level of deference accorded to the state proceedings is less than required under the substantial evidence test commonly applied in federal administrative law cases, but consideration should be given to the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996). Where there is a conflict between the findings and conclusions of the hearing panel and the final reviewing officer, a court may choose to credit the hearing panel's findings based on observation of the witnesses and reject the reviewing officer's analysis if it does not appear to give sufficient weight to the views of the professional educators. See id. Finally, courts are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

The Clynes invoked the administrative process to seek reimbursement for the cost of sending Nicholas to Churchill for the 1991-92 and 1992-93 school years. At the state hearing, both sides presented testimony and offered documentary evidence, and the hearing panel, composed of two educators and a lay person, applied the federal legal standard under IDEA. The panel denied the Clynes' claim for reimbursement for both school years, concluding that Nicholas had been making progress at Hawthorne, his disability did not warrant complete segregation from non-disabled students, and the school district was prepared to provide a free adequate public education to Nicholas.

The Clynes appealed this decision to a state level review officer (SLRO). The SLRO stated that it was not clear that the hearing panel had determined whether the education offered to Nicholas by the district was appropriate and that the panel had improperly placed the burden on the Clynes to show that their son was regressing at Hawthorne. The SLRO inferred that the district had not offered an adequate education program for 1991-92 because the panel had proposed significant changes in the 1992-93 IEP as a result of Nicholas' experience at Churchill. The SLRO described the prior IEPs as "hit and miss" and as not having produced a demonstrable plan of progress. He believed the district had not identified problem areas or applied appropriate resources in order to achieve satisfactory results and that it had not explained why Nicholas' performance is "the best that can be expected from him." The SLRO reversed the hearing panel decision with regard to the 1991-92 school year and ordered reimbursement through the end of October 1992.[1] Reimbursement beyond that time would only be available if the Clynes could demonstrate that they had been required to pre-pay tuition at Churchill without the right of refund.

The school district appealed the SLRO's decision to federal court. After a hearing the district court awarded reimbursement to the Clynes for both the 1991-92 and 1992-93 school years, as well as the 1991 summer school session. The court concluded that the 1991-92 IEP had not offered Nicholas a free appropriate public education and that Nicholas' education at Churchill complied with IDEA. It examined Nicholas' grades, test scores, and advancement from grade to grade at Hawthorne and found that Nicholas had not benefited "sufficiently" from his education there and that the 1991-92 IEP was inadequate. The IEP merely increased Nicholas' time in the learning disabled classroom and continued the past methods of teaching him to read, but it did not sufficiently address his needs or his behavioral problems. The court also

---

[1]The SLRO's award included reimbursement for the 1991 summer school session because he found Nicholas' participation in that session had been necessary in order to attend Churchill for the next school year.

believed the 1992-93 IEP did not comply with IDEA requirements because it did not offer appropriate reading instruction, was not designed to enable Nicholas to "recognize and accept his learning disabilities," and did not offer a completely segregated environment, which the court believed was the only appropriate environment for him. It primarily based its order of reimbursement for the 1992-93 school year, however, on the fact that the IEP had not been developed until after Nicholas had started the year at Churchill, and the Clynes had contracted to pay for the entire year.

## II.

Whether a school district has offered a free appropriate public education is a mixed question of fact and law and the district court's ultimate determination is reviewed de novo. Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995) Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992); but see Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 105 (4th Cir. 1991) ("whether or not a program is appropriate is a matter of fact"). The standard of review in this circuit is de novo as to the ultimate finding of the district court. See Petersen v. Hastings Pub. Sch., 31 F.3d 705, 707-08 (8th Cir. 1994).

IDEA requires a school district to offer an educational program "reasonably calculated to enable the child to receive educational benefits." Petersen, 31 F.3d at 707 (quoting Rowley, 458 U.S. at 206-07). Parents who believe their child will not receive an educational benefit under an IEP may enroll the child in a private school and later obtain reimbursement for those costs if a federal court concludes (1) the school district did not offer a free appropriate public education; and (2) the private school placement complied with IDEA. Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 13-14 (1993). Parents who enroll their child in private school without the approval of the public school district do so with the risk they will not receive reimbursement for their costs. School Comm. of Burlington, 471 U.S. at 373-74; Florence County, 510 U.S. at 15.

The goal of IDEA is to provide access to public education for all handicapped students. See Rowley, 458 U.S. at 179-81. Congress provided limited resources to the states to implement the policy of educating all disabled students, and the sufficiency of that education must be evaluated in light of the available resources. A.W. v. Northwest R-1 Sch. Dist., 813 F.2d 158, 164 (8th Cir. 1987); see also Rowley, 458 U.S. at 179-81 (intention to reach all unserved disabled students). IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense. Rowley at 203; A.W., 813 F.2d at 163-64. The statute only requires that a public school provide sufficient specialized services so that the student benefits from his education. Rowley, 458 U.S. at 195. IDEA's goal is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."[2] Id. at 192. IDEA requires disabled students to be educated with non-disabled students whenever possible. Id. at 202. In determining whether a disabled student's education is sufficient under IDEA, courts must consider the nature of the student's disability. Id.

The district court made extensive factual findings based on a hearing and on evidence presented to the state hearing panel. The school district diagnosed Nicholas as being delayed in reading and math by one year or more at the end of his first year at Hawthorne, and he subsequently repeated first grade.[3] In May 1991, when Nicholas was in third grade, his reading skills were at the second grade level, his word attack skills (which enable readers to identify words they have not seen before) were at the first grade level, and he could not write a complete sentence. He had received three Ds

---

[2]The SLRO stated that the district must show that it has "either produced satisfactory results or has an explanation why the student's performance is the best that can be expected from him." Under IDEA a school district is not required to maximize a student's potential.

[3]There was testimony at the state hearing that school authorities had wanted Nicholas to repeat kindergarten, but that the Clynes insisted that Hawthorne promote him to first grade.

and an F in reading that year and mostly Cs in all other subjects. A standardized test administered in September 1991, after Nicholas left Hawthorne, placed his reading skills in the second to ninth percentile. Nicholas' teachers at Hawthorne primarily used Dolch sight lists (visual cues and context) to teach him to read, but they also used phonics (auditory cues) to help him recognize words. Hawthorne emphasized use of the Dolch sight lists because Nicholas was more successful with this method, but he had not learned how to read long words that he did not recognize by sight. The school decreased the amount of time Nicholas spent in the learning disabled classroom from 26 percent in his second year in first grade to 13 percent of his time in third grade.

The district court found Nicholas had behavioral difficulties at Hawthorne. Evaluations of Nicholas done when he was in second grade characterized him as poorly motivated, easily frustrated, and feeling different from his peers. The 1991-92 IEP placed him with non-disabled students for the majority of the day. The court noted the following statements of district personnel: his third grade teacher had said "his attitude is reflected in his [poor] grades;" his "reading grade reflects his effort;" "[h]e needs to stop the excuses & just work;" and "[o]ften he appears to be apathetic about school." The court also found that one of Nicholas' teachers told Mrs. Clynes she did not know what else she could do since Nicholas had chosen not to learn, and the director of special education told her that some children are non-readers.

The district argues that Nicholas had made progress at Hawthorne and the IEPs were sufficient to confer an educational benefit. The court erred by requiring a program to maximize Nicholas' ability, by comparing his progress to non-disabled students, and by failing to examine the IEPs from the perspective of the time when they were written. The comments made by educators that were critical of Nicholas' attitude should not have been interpreted to mean that they had given up on addressing his problems, but rather as simply reflecting his behavior. Furthermore, the district court did not properly consider IDEA's requirement for educating disabled students in the least restrictive environment.

The Clynes respond by pointing out that Nicholas' reading skills were very weak when he left Hawthorne, that the public school system did not effectively address their concerns, and that the district had given up on educating him. Although the state hearing panel ruled in favor of the district, it had recommended that it incorporate techniques used by the Churchill school. The Clynes argue this recommendation necessarily supports the inference that the 1991-92 IEP did not offer a free appropriate public education because it was generally different from the Churchill program. The 1992-93 IEP in turn was inadequate because it did not incorporate the Churchill program as the state hearing panel had suggested. The Clynes also contrast the benefits Nicholas received from his education at Churchill with his difficulties at Hawthorne.

After studying the underlying factual findings of the district court in light of the record and legal standards under IDEA, we conclude that the school district did offer Nicholas a free appropriate public education as required by Congress. Although Nicholas may well have benefited more from his education at Churchill than at Hawthorne, and he did not read as well as his non-disabled peers or as his parents hoped, IDEA does not require the best possible education or superior results. The statutory goal is to make sure that every affected student receive a publicly funded education that benefits the student. Nicholas' record at Hawthorne indicates that he was making progress and that the 1991-92 IEP would have provided educational benefit to him. Despite his learning disabilities in reading and math, Nicholas earned passing marks in third grade[4] and mostly Cs in mathematics. Although Nicholas did not have well developed word attack skills, his overall reading skills had improved, and he had been promoted to fourth grade just before his parents removed him from Hawthorne. See Rowley at 203 (grades and advancement from grade to grade "an important factor[s] in determining educational benefit"). The 1991-92 IEP called for

---

[4]Nicholas received one failing grade in spelling in one quarter and another in reading in a different quarter, but he earned passing grades in both subjects in the other three quarters.

Nicholas to spend over one quarter of each school day in the specialized learning disabled classroom in order to address his disabilities, double the amount of the previous year.  See id. at 196 (noting that Congress "equated an 'appropriate education' to the receipt of some specialized educational services").  The Hawthorne IEP set goals in word recognition, comprehension, language skills and math, and the specialized education provided was reasonably calculated to enable him to benefit from his public education.[5]

The teaching methods used by Hawthorne were likely to confer an educational benefit.  Although the district court was disturbed by the level of Nicholas' word attack skills and the emphasis on Dolch sight lists for his reading instruction, it did not focus on the fact that the 1991-92 IEP set goals for word attack or on the testimony that phonics was also to be used.  The court's criticism of the educational methods used by the district was not based on findings of the state educators who reviewed the matter.  Courts "lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," Rowley, 458 U.S. at 208 (internal quotation marks and citation omitted), and they must "avoid imposing their view of preferable educational methods."  Id. at 207.  No state educational authority criticized Hawthorne's method of teaching Nicholas how to read.  Both of the state educational experts on the hearing panel found that Nicholas had benefited from the instruction provided at Hawthorne.  As long as a student is benefiting from his education, it is up to the educators to determine the appropriate educational methodology.  Id. at 208.

Placement of disabled students in segregated environments is appropriate "only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20

---

[5]The increase in specialized education for 1991-92 and the district's willingness to review the IEP to consider what was learned from Nicholas' experience at summer school belies the Clynes' assertion that the district had given up on educating Nicholas.

U.S.C. § 1412 (5). Although Nicholas' behavior may have been affected by his interaction with non-disabled peers, none of the state educational experts concluded that Nicholas needed a segregated environment. The SLRO attributed his poor behavior to his difficulty in academic classes, not to his association with non-disabled students, and the hearing panel indicated that Nicholas should not be segregated from non-disabled students. The 1991-92 IEP would have allowed Nicholas to interact with non-disabled students while providing educational benefit to him, and the conclusion of the state educational reviewers that a segregated environment was not appropriate for him is another factor indicating that the Hawthorne program complied with IDEA.

Even though the 1991-92 IEP met IDEA's requirements, the school district offered to improve it in the fall of 1991, but the Clynes removed Nicholas from Hawthorne before the district had an opportunity to review the IEP and attempt to come to agreement with them. Mrs. Clynes testified that in May 1991 she told the school district that she did not agree with the 1991-92 IEP, would not sign it, and would like it to be reviewed in the fall of 1991 in light of Nicholas' summer program at Churchill. The 1991-92 IEP itself stated that it was to be reviewed in September 1991, but before that time came the Clynes informed the school district in August that Nicholas had been enrolled in Churchill for the year. The abrupt removal of Nicholas from Hawthorne prevented the district from following through on the request made by the Clynes for a review in the fall and from responding to their then current concerns.[6]  See Evans v. District No. 17, 841 F.2d 824, 831-32 (8th Cir. 1988) (no failure to provide free appropriate public education where the school district had not been given an opportunity to change the child's educational placement).

---

[6]Contrary to the dissent's contention that the school district was unwilling to explore any different approaches, there is evidence that the school district would have altered Nicholas' IEP upon his return from the summer at Churchill. The IEP developed in 1992 called for changes in his instruction as a result of his experience at Churchill.

In sum, the Clynes were not entitled to reimbursement from public funds for the costs of sending Nicholas to private school in the summer of 1991 and the 1991-92 school year. The 1991-92 IEP called for an increase in special educational services in Nicholas' areas of disability while advancing IDEA's mainstreaming purpose by placing him with non-disabled students for a substantial portion of the school day. The IEP outlined his particular needs and responded to them in compliance with IDEA, and Hawthorne had agreed to consider possible improvements after Nicholas returned from summer school.

The Clynes removed Nicholas from Hawthorne without the permission of the school district before they sought review under IDEA, thus putting themselves at risk that they would not be reimbursed for private school costs. Evans, 841 F.2d at 832. Parents may not obtain reimbursement for the time a child is placed in private school without the permission of the school district if it is ultimately determined that the proposed IEP met the IDEA requirements. See Burlington Sch. Comm., 471 U.S. at 374; Evans, 841 F.2d at 832; see also 34 C.F.R. § 300.403 (1997) (no requirement for state to pay private school costs if child has available free appropriate public education). Since the 1991-92 IEP met IDEA requirements, the Clynes were not entitled under federal law to reimbursement for either the the 1991-92 or 1992-93 school years.[7]

---

[7]The 1992-93 IEP developed by the school district also met IDEA requirements. In August 1992, the school district offered to meet with the Clynes to resolve the issues relating to Nicholas' educational placement, and they met that month. Nicholas was re-evaluated by the school district in September, and although he was enrolled at Churchill and his parents had not yet sought review by the state hearing panel, his IEP was revised in October. The IEP called for double the amount of individualized special education compared to the 1991-92 IEP, and four times the amount he had received in 1990-91. The 1992-93 IEP set goals in, among other things, decoding, vocabulary, comprehension, and written expression. At the same time, he was placed with non-disabled students in non-academic subjects.

## III.

The issues raised by the Clynes in their cross-appeal are without merit.  They appeal the denial of their claim for reimbursement for interest on loans they took out to pay for Nicholas' private school education at Churchill.  We need not decide whether interest is ever available under IDEA because by enrolling Nicholas at Churchill without the permission of the school district, the Clynes took the risk that they would not receive reimbursement from public funds for their loans, let alone for the interest on them.  They also appeal  the dismissal of their claims for damages under IDEA, the Americans with Disabilities Act (ADA), 42 U.S.C. §12132; 42 U.S.C. § 1983; and Section 504 of the Rehabilitation Act of 1973, § 794, for physical illness and emotional distress caused by the district's allegedly incompetent and unprofessional failure to provide Nicholas with an adequate education.  The damage claim cannot succeed because the district offered Nicholas a free appropriate public education, and damages are not available for IDEA violations.  Heidemann v. Rother, 84 F.3d 1021, 1033 (8th Cir. 1996).  We affirm the rulings of the district court on these issues.

## IV.

For the reasons discussed, the public school district was not obligated to reimburse the Clynes for Nicholas' education at the Churchill private school, and the Clynes have not shown that the district court erred in denying them relief on their cross- appeal.  We affirm in part, reverse in part, and remand for entry of judgment in favor of the school district.


Floyd R. Gibson, Circuit Judge, concurring in part and dissenting in part.

I agree that our decision in Heidemann v. Rother, 84 F.3d 1021, 1033 (8th Cir. 1996), precludes the Clyneses from recovering damages in this action, and I can

conceive of no authority that would allow them compensation for interest on loans they took out to pay for Nicholas's private schooling. Therefore, I concur in Part III of the Court's opinion. Nonetheless, because I would affirm the district court's judgment _in toto_, I respectfully dissent from Part II of the opinion.

IDEA makes available federal money to assist the states in educating disabled children. See _Board of Educ. v. Rowley_, 458 U.S. 176, 179 (1982). To share in these funds, participating states must agree to offer a "free appropriate public education" to all disabled children. 20 U.S.C. § 1412(1) (1994). As a measure to ensure that Congressional goals are met, IDEA directs local school districts, in consultation with parents, teachers, and, where appropriate, the child himself, to develop an "individualized education program" ("IEP") for each disabled student. _Id._ § 1401(18), (20). An IEP satisfies IDEA's requirement of a free and appropriate education so long as it "consists of educational instruction specially designed to meet the unique needs of the [disabled] child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." _Rowley_, 458 U.S. at 188-89.

If parents feel that their child's IEP does not afford a free appropriate public education, they may, under certain circumstances, unilaterally place the child in a private school pending administrative and judicial review of the IEP. See _School Comm. of Burlington v. Department of Educ._, 471 U.S. 359, 369-70 (1985). This is, at least from a financial perspective, a perilous maneuver, for as the majority correctly recognizes, parents are entitled to reimbursement for the costs of enrolling their disabled child in a private facility "_only_ if a federal court concludes both that the public placement violated IDEA, and that the private school placement was proper under the Act." _Florence County Sch. Dist. Four v. Carter_, 510 U.S. 7, 15 (1993). Applying this test to the facts of the instant case, I agree with Judge Gunn that the Clyneses are entitled to compensation for the expenses they incurred in sending Nicholas to the Churchill School.

Before proceeding to the merits of this appeal, a word must be said about the applicable standard of review. We have described federal review of the state administrative process as a "quite narrow" endeavor. Petersen v. Hastings Pub. Sch., 31 F.3d 705, 707 (8th Cir. 1994). This is because the federal courts do not possess "the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," Rowley, 458 U.S. at 208 (quotations omitted), and we must therefore give "due weight" to the state proceedings, id. at 206. In IDEA cases originating from a state such as Missouri, which has created a two-tiered administrative system, we must give deference to the opinion of the state level review officer ("SLRO"), who is the person empowered to issue a final decision for the state. See Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 624 (6th Cir. 1990)("[T]he only logical position, under Rowley and general principles of administrative law, is that federal courts are required to defer to the final decision of the state authorities, in this case that of the SLRO."); Karl v. Board of Educ., 736 F.2d 873, 877 (2d Cir. 1984)("We believe Rowley requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer."); cf. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996)(declining to definitively answer this question); Carlisle Area Sch. v. Scott P., 62 F.3d 520, 528-30 (3d Cir. 1995)(deeming it appropriate to defer to opinion of state appeals panel, but assuming that the federal courts should accord somewhat less consideration to an appeals panel ruling that disregards a hearing officer's credibility findings which find support in the record), cert. denied, 116 S. Ct. 1419 (1996). Likewise, though the majority is correct in stating that we should examine de novo a district court's ultimate determination of whether an IEP is appropriate, we are bound by a district court's underlying factual findings unless they are clearly erroneous. See Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1374 (8th Cir. 1996).

In light of the detailed factual findings made by the district court, and giving "due weight" to the SLRO's determination that the IEP for the 1991-1992 school year

was inappropriate, I am unable to conclude that Fort Zumwalt provided Nicholas a free appropriate public education for that period. The district court found that from September of 1989 to May of 1991 Nicholas's word attack skills had not risen above a first grade level, see Fort Zumwalt Sch. Dist. v. Missouri State Bd. of Educ., 923 F. Supp. 1216, 1222 (E.D. Mo. 1996), and a standardized test administered in September of 1991 revealed that his reading proficiency ranked in the second to ninth percentile, see id. at 1224. At the close of his fifth year in the Fort Zumwalt School District, Nicholas Clynes, at the age of ten, still did not know the alphabet, could not recite the days of the week, and could not identify the months of the year.[8] See id. at 1222. It is true, as the majority points out, that Fort Zumwalt promoted Nicholas to the fourth grade, but it is notable that in third grade Nicholas did not receive a mark above a "C." See id. at 1221. By the end of the year, Nicholas had failed Spelling and had managed to raise a failing grade in Reading for the third quarter to a "D" for the final quarter. See id.

In the face of these disturbing trends, Fort Zumwalt prepared an IEP for 1991-1992 that did not propose any significant changes in Nicholas's educational placement. See id. at 1222. The IEP did set goals in word attack skills, but Nicholas's resource room instructor, Miss Ruhr, testified that she would continue to emphasize the child's ability to recognize the meaning of sighted words, a method that had failed miserably in the past to enhance Nicholas's reading aptitude. See id. At the meeting to discuss the IEP, the Clyneses expressed concern with Nicholas's inability to read and asked what alternatives were available to their son. See id.; App. at 459-60. The district reacted by attributing Nicholas's academic shortcomings to his own poor attitude and refusal to put forth the requisite effort. See Fort Zumwalt, 923 F. Supp. at 1222. Miss Ruhr stated that she had "tried everything" and did not "know what else to do"; in her

---

[8]At Nicholas's state due process hearing, his father, Robert Clynes, testified that the child had mastered these tasks within two weeks after entering the Churchill School. App. at 477.

opinion, Nicholas had "chosen not to learn." See id.; App. at 26. Alarmed by this response, Mrs. Clynes later telephoned Pat Moore, Fort Zumwalt's director of special education, to discuss Nicholas's meager progress. See Fort Zumwalt, 923 F. Supp. at 1222. Mrs. Moore informed the worried mother that some children are simply "non-readers" despite the district's best efforts. See id. After deciding that the district had given up on Nicholas,[9] the Clyneses enrolled the child in the Churchill School.

I agree with the SLRO and the district court that the IEP for 1991-1992 was not designed to provide "personalized instruction with sufficient support services to permit [Nicholas] to benefit educationally from that instruction." Rowley, 458 U.S. at 203. By submitting an IEP substantially similar to others that had previously produced so few positive results, and by exhibiting an unwillingness to explore any different approaches,[10] Fort

_____

[9]Mrs. Clynes's testimony regarding her conversation with Mrs. Moore provides revealing insight into the parents' point of view:

> At that time, you know, [after Mrs. Moore had made the remark] about the non-reader, I then asked her if she had any knowledge of Churchill. She said, "Yes, I'm aware of Churchill but, no, I don't per se know the programs, or anything like that," and I had let her know that, "I'm quite concerned that something needs to be done," that I had been to my pediatrician, that, you know, "He is recommending that Nick needs more help in this area," and she made no offer whatsoever of maybe I need to sit down with you, maybe we need to get together and see if there's a better program for your son, at which time I proceeded to hang up from her, call my husband and say, "That's it, no one gives a blank about our son, it's time for us to take control," and I did.

App. at 435-36.

[10]The majority contends that "[n]o state educational authority criticized [the district]'s method of teaching Nicholas how to read," but the SLRO's decision included the following admonition:

> The various IEPs show a hit and miss approach to dealing with [Nicholas's] failures. There was no focused effort to follow up on failures and to produce a plan of progress that could be clearly demonstrated. The

-16-

Zumwalt did not extend to Nicholas the free and appropriate

District is not under any obligation to make Nicholas an honor student, however it should demonstrate that it has identified the problem areas, applied the appropriate resources and has either produced satisfactory results or has an explanation why the student's performance is the best that can be expected from him.

App. at 34-35 (emphasis added). While this might not be an outright condemnation of Fort Zumwalt's teaching methods, it comes very close, and it certainly discloses the SLRO's assessment that the IEP was clearly deficient. Cf., e.g., 20 U.S.C. § 1401(20)(F) (instructing that an IEP should contain "appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved").

education mandated by IDEA.  To be sure, Nicholas was steadily advancing from grade to grade in the Fort Zumwalt schools, and the Supreme Court has stressed that "[t]he grading and advancement system . . . constitutes an important factor in determining educational benefit," Rowley, 458 U.S. at 203, but Nicholas's achievements, particularly in the area of reading skills, can at best be described as trivial.  This cannot be the sort of education Congress had in mind when it enacted IDEA.  See Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120-21 (2d Cir. 1997)(reasoning that the Rowley standard contemplates more than mere trivial advancement); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 183 (3d Cir. 1988)("[W]hen the Supreme Court said 'some benefit' in Rowley, it did not mean 'some' as opposed to 'none.'  Rather, 'some' connotes an amount of benefit greater than mere trivial advancement."), cert denied, 488 U.S. 1030 (1989); Hall v. Vance County Bd. of Educ., 774 F.2d 629, 636 (4th Cir. 1985)("Clearly, Congress did not intend that a school system could discharge its duty under [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial."); cf. Rowley, 458 U.S. at 203 n.25 ("We do not hold today that every [disabled] child who is

advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'").  The majority, in resolving that Fort Zumwalt did offer Nicholas a free appropriate public education, not only does disservice to Congressional intent, but also disregards the deference we are required to give to the conclusion reached by the SLRO.[11]

---

[11]The Court does not seem to place dispositive weight upon our decision in Evans v. District No. 17, 841 F.2d 824 (8th Cir. 1988), but the Court does suggest that the Clyneses did not comply with the notice requirement we announced in that case. I disagree.  In Evans, we affirmed the district court's denial of reimbursement to parents who had precipitously enrolled their child in a private school, explaining that "[a] school district should be on notice of disagreements and given an opportunity to make a voluntary decision to change or alter the educational placement of a [disabled] child." Id. at 831-32.  We acknowledged, however, that parents may independently choose an appropriate private placement "if it is likely that no change would be made which would benefit [the child] (if the school district had made it clear that no change in the placement would occur)."  Id. at 832.

Unlike the claimants in Evans, see id. at 831, the Clyneses specifically requested some alternative placement for Nicholas.  See App. at 460 ("[A]t th[e IEP] meeting I said, 'Well, what else can you offer, self-contained?'"); App. at 475-76 ("During the [IEP] meeting we said we were very dissatisfied with what was happening with Nick, he still wasn't learning.  We asked them at that point in time what other programs they had, and my wife mentioned self-contained, and they said at that point in time Nick was not a candidate for self-contained."); App. at 435-36 ("I had let [Pat Moore] know that, 'I'm quite concerned that something needs to be done,' that I had been to my pediatrician, that, you know, 'He is recommending that Nick needs more help in this area,' and she made no offer [of help].").  The position adopted by Nicholas's educators in answer to these pleas, as disclosed by statements at the IEP meeting and Mrs. Moore's comments to Mrs. Clynes, evidenced a likelihood that "no change would be made which would benefit [Nicholas]," Evans, 841 F.2d at 832, and there is absolutely no reason to believe that the district would have drastically altered its stance had it received one more opportunity to assess the IEP.  Consequently, I do not think Evans stands as an impediment to reimbursement in this case.

-19-

In sum, I think the district court properly decided that the 1991-1992 IEP was deficient. I additionally believe the Churchill School was without a doubt an appropriate placement for Nicholas (the facts confirm his improvement at that school),[12] and I would thus hold that the Clyneses are entitled to reimbursement for the summer of 1991 and the 1991-92 school year. Furthermore, because the district did not prepare the 1992-93 IEP until after the Clyneses had contractually committed to send Nicholas to Churchill for that term, I would also approve reimbursement for the 1992-93 school year. To the extent the majority has decided otherwise, I respectfully dissent.

A true copy:

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[12]Having determined that Fort Zumwalt did offer Nicholas a free appropriate public education, the majority has apparently found it unnecessary to evaluate the propriety of placement at the Churchill School. The Court does, though, mention IDEA's mainstreaming requirement. See 20 U.S.C. § 1412(5) (1994). I would hold that the preference for mainstreaming is honored where parents send their child to an academy, such as the Churchill School, which employs a curriculum designed to prepare the student for a return to a regular classroom environment.

-20-